[913 NE2d 394, 885 NYS2d 8]

Buffalo Crushed Stone, Inc., Appellant, v Town of Cheek-towaga, Respondent.

Argued June 4, 2009; decided June 30, 2009

90

**POINTS OF COUNSEL**

*Harter Secrest & Emery LLP,* Buffalo (*John G. Horn* of counsel), for appellant. I. Seen in the unique context of quarrying

activities, the conduct of Buffalo Crushed Stone, Inc. and its predecessors unquestionably constitutes a manifest intent to quarry the entirety of their land. (*Matter of Syracuse Aggregate Corp. v Weise*, 51 NY2d 278; *Matter of Fairmeadows Mobile Vil. v Shaw*, 16 AD2d 137; *Matter of Rudolf Steiner Fellowship Found. v De Luccia*, 90 NY2d 453; *United Citizens of Mount Vernon v Zoning Bd. of Appeals of City of Mount Vernon*, 109 Misc 2d 1080; *Village of Sands Point v Sands Point Country Day School*, 2 Misc 2d 885, 2 AD2d 769.) II. Indian Road does not render the portion of Buffalo Crushed Stone, Inc.'s property east of Indian Road "physically separate" for purposes of a nonconforming use analysis. (*Matter of Syracuse Aggregate Corp. v Weise*, 51 NY2d 278; *Town of Somers v Camarco*, 308 NY 537; *Matter of Dolomite Prods. Co. v Kipers*, 23 AD2d 339; *New York Trap Rock Corp. v Town of Clarkstown*, 1 AD2d 890.)

*David J. Seeger*, Buffalo, and *Alison L. Odojewski* for respondent. I. The written agreement between Buffalo Crushed Stone, Inc. (BCS) and the Town of Cheektowaga bars all of BCS's claims. (*Guishard v General Sec. Ins. Co.*, 9 NY3d 900; *Harris v Niagara Falls Bd. of Educ.*, 6 NY3d 155; *Frehe v Schildwachter*, 289 NY 250; *Putnam v Otsego Mut. Fire Ins. Co.*, 45 AD2d 556; *Post v Thomas*, 212 NY 264; *Sundstrom v State of New York*, 213 NY 68; *Dimmers v Armitage*, 33 App Div 626; *Mencher v Weiss*, 306 NY 1; *Brunner-Booth Fotochrome Corp. v Kaufman*, 18 AD2d 160; *Turkish Socy. of Rochester v Cimino*, 192 AD2d 1121.) II. Buffalo Crushed Stone, Inc. may not advance a new theory and argument for the first time on appeal that could have been obviated or cured through factual showing or legal argument in the courts below. (*Bingham v New York City Tr. Auth.*, 99 NY2d 355; *Post v 120 E. End Ave. Corp.*, 62 NY2d 19; *Matter of Richardson v Fiedler Roofing*, 67 NY2d 246; *Cibro Petroleum Prods. v Chu*, 67 NY2d 806; *Matter of Syracuse Aggregate Corp. v Weise*, 51 NY2d 278; *Matter of Harbison v City of Buffalo*, 4 NY2d 553; *Matter of Crossroads Recreation v Broz*, 4 NY2d 39; *People v Miller*, 304 NY 105; *Matter of Pisicchio v Board of Appeals of Vil. of Freeport*, 165 Misc 156; *Matter of Rudolf Steiner Fellowship Found. v De Luccia*, 90 NY2d 453.) III. Parcel 5, east of Indian Road, is not entitled to lawful nonconforming use status. (*Matter of Syracuse Aggregate Corp. v Weise*, 51 NY2d 278; *People v Miller*, 304 NY 105; *Matter of Harbison v City of Buffalo*, 4 NY2d 553; *Matter of Dolomite Prods. Co. v Kipers*, 23 AD2d 339, 19 NY2d 739; *New York Trap Rock Corp. v Town of Clarkstown*, 1 AD2d 890, 3 NY2d 844; *Matter of McQuade v Zoning Bd. of Appeals of Town of Huntington*, 248

AD2d 386; *Speonk Sand & Gravel Co. v Town of Southampton,* 127 AD2d 828; *Matter of Keller v Haller,* 226 AD2d 639; *Martino v Town of Bergen,* 98 AD2d 968; *Marra v State of New York,* 61 AD2d 38.) IV. Mining on any of the remaining disputed parcels would unlawfully extend Buffalo Crushed Stone, Inc.'s former nonconforming use rights. (*Matter of Syracuse Aggregate Corp. v Weise,* 51 NY2d 278; *Goulding v Town of Tonawanda,* 282 App Div 321; *Smith v Town of Sandy Creek,* 12 Misc 2d 916; *City of Buffalo v Delaware, Lackawanna & W. R.R. Co.,* 190 NY 84; *Kayner v Brown,* 167 App Div 958; *Dotsko v Littlejohn,* 31 AD2d 245; *Suffolk County Natl. Bank of Riverhead v State of New York,* 60 AD2d 679; *De Cuyper v Gonzales,* 214 AD2d 764; *Daetsch v Taber,* 149 AD2d 864; *Pless v Town of Royalton,* 185 AD2d 659, 81 NY2d 1047.)

*Gilberti Stinziano Heintz & Smith, P.C.,* Syracuse (*Adam J. Schultz, Kevin G. Roe* and *Patricia S. Naughton* of counsel), for New York State Construction Materials Association, Inc., amicus curiae. I. *Matter of Syracuse Aggregate Corp. v Weise* (51 NY2d 278 [1980]) does not support the fragmentation approach to nonconforming use analysis adopted by the majority opinion below. (*People v Miller,* 304 NY 105; *Ilasi v City of Long Beach,* 38 NY2d 383; *Glacial Aggregates LLC v Town of Yorkshire,* 57 AD3d 1362.) II. The lower court's exclusion of the eastern reserves (parcel 5) on the theory that it was physically separate from the remainder of the quarry not only threatens to create a per se rule not intended by *Matter of Syracuse Aggregate Corp. v Weise* (51 NY2d 278 [1980]) but is clearly contrary to both facts and law. (*New York Trap Rock Corp. v Town of Clarkstown,* 1 AD2d 890; *Matter of Dolomite Prods. Co. v Kipers,* 23 AD2d 339, 19 NY2d 739.)

**OPINION OF THE COURT**

CIPARICK, J.

In this zoning case, the issue is whether Buffalo Crushed Stone, Inc. (BCS) established a prior nonconforming use to quarry certain subparcels of its 280-acre property, thereby relieving it from the Town of Cheektowaga's zoning ordinances. Applying the analysis set forth in *Matter of Syracuse Aggregate Corp. v Weise* (51 NY2d 278, 284-287 [1980]), we hold that the long and exclusive quarrying operation of BCS and its predecessors and their preparations to use areas left as aggregate mineral reserves—consistent with the nature of quarrying—established a right of prior nonconforming usage on the disputed

subparcels. We conclude, however, that this right does not extend to subparcel 25D and to the thoroughfares, or roadway subparcels (28A/28B, 29A/29B, 30A/30B and 31-33), because there are factual issues remaining as to whether BCS's predecessors acquired these areas prior to the 1969 zoning ordinance.

## I

BCS owns approximately 280 acres of property in the Town of Cheektowaga, where it operates a hard-rock quarry. For the past 80 years, BCS and its predecessors, including Federal Crushed Stone Corporation (Federal),[1] have devoted the land exclusively to quarrying. The quarry consists of mineral extraction sites located primarily in the center of the property, along with processing areas, buffer zones and roads. BCS and its predecessors acquired the land in a number of transactions, either by purchase or lease, between 1929 and 1992. Only some of these subparcels—comprising four geographic regions located in the east, south and west—are relevant in this case. The disputed subparcels are mainly areas that BCS maintained as mineral reserves, which have not been quarried.

Before 1942, there were no zoning ordinances or other limitations on the property's usage. The Town then enacted ordinances, demarcating the property into certain zones or districts, and denominating such zones as residential, industrial and an airport. Federal's land was classified within the Second Industrial District. The ordinance allowed gravel pits and stone quarries to be constructed in this zone, provided that the quarry company procure a permit. The ordinance explicitly permitted nonconforming uses to continue unabated upon the condition that no buildings in the Second Industrial District be enlarged or destroyed.

In 1969, the Town repealed the 1942 ordinance, enacting the 1969 zoning ordinance that divided Federal's lands into four zoning districts: a residential district, a business district, a manufacturing district and a "special" district. Article VII of the ordinance, entitled "NON-CONFORMING USE REGULATIONS," permitted the continuation of nonconforming activities on the property, but prohibited their extension or enlargement. Thus, this ordinance permitted Federal to continue its mining operation within the "AG—Special Aggregates District"

---

1. Federal was previously known as Cheektowaga Crushed Stone Corporation. It later merged with Bituminous Products Corporation to form Buffalo Slag Company. In 1983, BCS purchased Buffalo Slag and acquired its land.

(AG district) in what is now the center of BCS's operation. In 1992, the Town repealed its 1969 zoning ordinance, adopting new zoning laws that were amended in 1996 and 1997; none of these ordinances altered the boundaries and relevant regulations of the AG district.

In 1998, BCS commenced this action, seeking a declaratory judgment that zoning restrictions applicable to the unexcavated areas of its property were void, and a judgment to enjoin the Town from enforcing its zoning regulations as to those areas. The Town moved for summary judgment and for a declaration that its zoning ordinances were enforceable. BCS then cross-moved for summary judgment on its claims.

Supreme Court, declaring the rights of the parties, held that subparcels within the Town's AG district are entitled to nonconforming use status, and thus quarrying in those subparcels was permissible. The court further held that subparcels 17C/25C and 25I/12B, south of the AG district—in a residential zone—were entitled to prior nonconforming usage because they were subject to quarrying permits issued by the Town before the 1969 ordinance. However, the court did not grant such status to parcels located to the east (subparcel 5), to the west (subparcel 25D) and to certain remaining parcels.[2] Both parties appealed.

The Appellate Division considered whether BCS had established a nonconforming use for four geographic subparcels: (1) the large eastern area (subparcel 5); (2) the western area (subparcel 25D); (3) the southern and eastern thoroughfares or roadways (subparcels 28A/28B, 29A/29B, 30A/30B and 31-33); and (4) the southern parcels adjacent to the AG area (subparcels 17C/25C, 12B/25I).

Subparcel 5 is a relatively large area, located in the northeastern portion of the property, immediately adjacent to the AG district. Most of this area is divided from the AG district by Indian Road, a relatively narrow roadway of approximately 49.5 feet in width, extending south to north. Indian Road then turns eastward, dividing this subparcel into a northern portion and a southern portion. BCS's predecessors in interest acquired this area in 1931, but did not quarry it.

---

2. BCS does not challenge Supreme Court's order with respect to certain subparcels that it deemed not integral to its mining operation. Also, the Town has conceded that BCS enjoys lawful nonconforming use of certain other subparcels.

Indian Road once extended further north, separating all of subparcel 5 from the AG district. Prior to 1951, the northernmost portion of the road was rerouted over Federal's property, rendering it inaccessible to the public. BCS claims that five million tons of aggregate material suitable for excavation is available for appropriation in subparcel 5.

Subparcel 25D is situated in the westernmost region of BCS's property. BCS contends that, in 1959, Federal leased the area from a Dr. Reinstein for the explicit purpose of quarrying and mining limestone. The Town asserts, however, that BCS did not acquire a possessory interest or legal title to the area until 1991—long after the enactment of its zoning ordinances. It is undisputed that neither BCS nor its predecessors obtained a permit to quarry the area before 1969.

Subparcels 28A/28B, 29A/29B, 30A/30B and 31-33 are thoroughfares or roadways located in the southern and eastern portions of the AG district. BCS avers that these roads are long abandoned. They are part of the property leased and conveyed to Federal, contiguous to the AG district, and have been actively mined by BCS and its predecessors for several decades. BCS's predecessors received quarrying permits for portions of these areas in 1955 and 1960.

Subparcels 17C/25C and 12B/25I were leased in approximately 1952, and the Town issued Federal a permit to quarry parts of these subparcels at that time. They are also contiguous to the AG district. Although Federal cleared this area by stripping it of topsoil before 1969, it has not been actively quarried.

The Appellate Division modified Supreme Court's decision by additionally granting the Town summary judgment as to subparcels 17C/25C and 12B/25I. The court held that these subparcels were not entitled to prior nonconforming usage because BCS's predecessors had not mined them prior to 1969 (55 AD3d 1228, 1231-1232 [4th Dept 2008]). Two Justices dissented as to these subparcels, stating that BCS should not be required to demonstrate actual quarrying activities on each contested subparcel, because such a predicate is not required under controlling prior nonconforming use precedent on quarrying enterprises, and these subparcels should generally be viewed in the context of the entire property as a whole (*see id.* at 1232-1234). The dissent further stated that BCS and its predecessors had engaged in substantial quarrying activities on the entire 280-acre property for many years; had never utilized the land for

any other purpose; and these subparcels were contiguous to BCS's excavation sites. Thus, the dissenters concluded that BCS satisfied the prior nonconforming use standard (*see id.* at 1232-1234).

Addressing subparcel 5, the Appellate Division stated that this subparcel's physical separation by Indian Road from other parts of the property prevents prior nonconforming use status for that area (*see id.* at 1230-1231). The entire panel was unpersuaded by BCS's evidence that it manifested an intent to use this area for quarrying.

Regarding subparcel 25D, the Appellate Division held that BCS did not demonstrate its right to quarry that subparcel before 1969 because Federal's lease of the property contained a description of the land that could be quarried that did not expressly include this area (*see id.* at 1231). Further, the court noted that BCS's predecessors had not conducted substantial quarrying activities on subparcel 25D before 1969 (*see id.*). In response, the dissenters stated that summary judgment was inappropriate because an issue of fact remained as to whether BCS's predecessors acquired rights to quarry this subparcel in 1969 (*see id.* at 1232). They cited an affirmation from a title examiner and attorney concluding that subparcel 25D was acquired in fee or by lease prior to 1969, as well as an affidavit submitted by a BCS executive vice-president, stating that this subparcel was leased in 1959 by plaintiff's predecessor in interest (*see id.*).

Finally, as for the thoroughfares, subparcels 28A/28B, 29A/29B, 30A/30B and parcels 31-33, the Appellate Division held that although they are contiguous to the AG district and they had been abandoned as roadways—having not been traveled or used as a highway for six years (*see* Highway Law § 205 [1])—BCS is not entitled to quarry those areas because it did not conduct mining operations on them before the adoption of the zoning ordinances (*see id.* at 1231). However, the court found that the northern part of parcel 31 is located within the AG district, rendering quarrying a permitted use there (*see id.*). The dissenters agreed that the streets were abandoned as a matter of law, but disagreed with the majority on the ground that *Syracuse Aggregate* (51 NY2d at 285-287) does not require every inch of the property be mined to trigger prior nonconforming use (*see* 55 AD3d at 1232-1233). BCS appeals as of right, pursuant to CPLR 5601 (a), and we now modify.

## II

As a preliminary matter, the Town contends that BCS is barred from bringing this action by a 1997 settlement agreement. But the dispute ending in that settlement arose from an action brought by BCS seeking a tree removal permit—it did not encompass the more extensive claims brought in this action. Additionally, the settlement reveals that BCS stipulated to narrow terms as to its quarrying operation—"(c) BCS will adhere to the mining restrictions contained in Section 82-28 of the Town Zoning Law (i.e., setbacks)." The only mining restriction contained in Town of Cheektowaga Code (Zoning Law) § 260-38 is subdivision B, which provides for excavation setbacks from areas used by the public. More specifically, it provides that no structure, use or excavation "shall be closer than 200 feet from a public right-of-way or adjacent property line" (*see id.*). Hence, the 1997 agreement does not prevent BCS's action from going forward, as it does not affect any quarrying rights disputed in this case.

## III

Turning to the merits, prior nonconforming uses in existence when a zoning ordinance is adopted are, generally, constitutionally protected even though an ordinance may explicitly prohibit such activity (*see People v Miller*, 304 NY 105, 107 [1952]). Courts and municipal legislators have shown a "grudging tolerance" towards this doctrine, disfavoring its broad application, as "[t]he law . . . generally views nonconforming uses as detrimental to a zoning scheme, and the overriding public policy of zoning in New York State and elsewhere is aimed at their reasonable restriction and eventual elimination" (*Matter of Toys "R" Us v Silva*, 89 NY2d 411, 417 [1996] [internal quotation marks omitted]). Although nonconforming uses are "generally permitted to continue, they may not be enlarged as a matter of right" (*Matter of Rudolf Steiner Fellowship Found. v De Luccia*, 90 NY2d 453, 458 [1997]). However, property owners engaging in a particular activity may have secured a "vested right" to use their land accordingly (*Miller*, 304 NY at 107-108). Courts strive to see that "the public interest in eliminating nonconforming uses at a legally opportunistic time is placed in reasonable balance with the owner's interest in not having a property investment abruptly altered or terminated" (*Matter of Pelham Esplanade v Board of Trustees of Vil. of Pelham Manor*, 77 NY2d 66, 72 [1990]).

A party advancing a prior nonconforming use exception to a zoning ordinance must establish specific actions constituting an overt manifestation of its intent to utilize the property for the ascribed purpose at the time the zoning ordinance became effective; a mere contemplation of purpose, lacking supportive evidence of undertakings to effectuate such intentions, will not suffice (*see Syracuse Aggregate*, 51 NY2d at 284-285, citing *Matter of Harbison v City of Buffalo*, 4 NY2d 553, 559-560 [1958]). Every inch of the land need not have been employed for the asserted purpose, but utilizing just a portion of the property will not necessarily trigger the protections of this doctrine (*see id.* at 285). Central to this standard is "an examination of the nature of the particular nonconforming use in issue as well as the activities engaged in by the landowner in effectuating that use prior to the adoption of the restrictive ordinance" (*id.*).

In *Syracuse Aggregate*, we held that a quarrying company was entitled to prior nonconforming use status because its activities sufficiently demonstrated an intent to appropriate an entire parcel of land for excavation and quarrying prior to the passage of a restrictive zoning law (*see* 51 NY2d at 286). There, the landowner purchased a 25-acre parcel of land in 1978 that had been used as a quarry for more than 50 years (*see id.* at 282). The land was zoned as a residential district in 1961 (*see id.*). In discussing the nature and character of quarrying, we stated:

> "By its very nature, quarrying involves a unique use of land. As opposed to other nonconforming uses in which the land is merely incidental to the activities conducted upon it, quarrying contemplates the excavation and sale of the corpus of the land itself as a resource. Depending on customer needs, the land will be gradually excavated in order to supply the various grades of sand and gravel demanded. Thus, as a matter of practicality as well as economic necessity, a quarry operator will not excavate his entire parcel of land at once, but will leave areas in reserve, virtually untouched until they are actually needed" (*id.* at 285 [citations omitted]).

Consequently, a prior nonconforming use for quarrying cannot be limited solely to the land that was actually excavated before the zoning law, because—in this unique type of industry—landowners commonly leave portions of their land as mineral reserves to be excavated at a future time (*see id.*). A landowner

who engages in substantial quarrying activities within its property and demonstrates an intention to do so in other portions of the land may sufficiently establish a prior nonconforming use extending to the boundaries of that property, notwithstanding the fact that quarrying may not have actually begun in that specific area.

Conversely, merely preparing to engage in a quarrying enterprise or "undertaking a few self-serving acts of a very limited nature" will not satisfy the requisite standard (*see id.* at 286). Nor does prior nonconforming use status extend to adjoining parcels separated by physical boundaries (*see id.*). In this regard, *Syracuse Aggregate* does not afford quarrying companies "carte blanche" to engage in future excavation of their lands contrary to zoning regulations (*see id.* at 286-287).

As in *Syracuse Aggregate*, BCS and its predecessors acquired the property exclusively for mining and quarrying operations— "no part of the land was ever dedicated to a use other than . . . quarrying" (*id.* at 286). Similar to *Syracuse Aggregate*, BCS constructed a processing structure in the center of the 280-acre property, where bulk materials were removed for decades, and service roads constructed to move the materials after they are processed (*see id.*). Further, the processing plant contains a building for packaging materials, a repair shop and offices. In *Syracuse Aggregate*, we determined that "[g]iven such outward manifestations of intent and in light of the unique character of the business engaged in, it can only be concluded that the nonconforming use extends throughout the property even though the principal excavation was limited to a five-acre portion of the parcel" (*id.* at 286). The same pertinent factors are present here.

## IV

We now analyze the four specific geographic areas in dispute, applying the rationale of *Syracuse Aggregate*.

Subparcel 5:

■ As noted, because of the nature and character of the quarrying industry, landowners commonly quarry one portion of their land at a time and leave other areas as reserves (*see id.* at 285-286). Reviewing BCS's quarrying activity both in the center of its property and in the respective subparcels, it is clear that it manifested an intent to quarry subparcel 5. BCS and its predecessors have (1) prepared maps of the area to survey

potential materials that could be extracted from the land; (2) put in place 6,000 feet of 16-inch piping from the property to the pumping station; (3) negotiated, from 1963 to 1969, with the Town to relocate Indian Road for unfettered use of its entire parcel for mining, thereby providing the Town with notice of its intent to use the area accordingly; (4) sent letters to the Town expressing an intent to mine the area in 1963; (5) made preparations to have a company remove dirt from the region to allow for excavation; and (6) drilled "auger holes," which are used to identify areas for quarrying.

Although Indian Road separates subparcel 5 from the aggregate zone, this relatively narrow roadway (49.5 feet) is not a physical impasse that cuts off subparcel 5 from the contiguous parcels. Nor does it substantially alter the nature and character of the property as a whole, as BCS and its predecessor companies have long manifested their intent to mine both sides of the road, and jointly with the Town have maintained the road, using the same for trucks and pipelines incident to their quarrying operation.

In this regard, the dissent's reliance on *Matter of Dolomite Prods. Co. v Kipers* (23 AD2d 339, 343-345 [4th Dept 1965])—a pre-*Syracuse Aggregate* case—is misplaced (*see* dissenting op at 104, 106). In *Dolomite*, the Appellate Division considered whether a quarrying company could extend its enterprise from one parcel of land to two southern parcels physically separated from the quarrying area by railroad tracks (*see id.*). Although the northern portion of the land had been used for quarrying, the two areas below the railroad tracks had been used, for 40 years, as a farm and a nursery (*see* 23 AD2d at 341). During that time, thousands of homeowners purchased homes in the area encircling the two parcels (*see id.*). The Appellate Division held that the quarrying company could not extend its nonconforming use to the two separate regions that had been used for entirely different purposes, especially given the patent unfairness to the multitude of residents now living in those areas who would be deleteriously affected by the quarrying operations so close to their homes (*see id.* at 342-343).

Here, in contrast, BCS has appropriated subparcel 5 as a reserve for quarrying and no other purpose—it is not extending its nonconforming use, but seeking to realize its vested right to use the land in accord with a long-standing manifested intent to quarry this area. Significantly, because most of subparcel 5 borders a landfill, fairness concerns, arising in *Dolomite*, for

people moving into properties constructed adjacent to the quarry, are not raised here. Further, BCS does not dispute that there are 200-foot setbacks in place, pursuant to its 1997 settlement agreement with the Town, prohibiting it from excavating within 200 feet from a public right-of-way or adjacent property lines. Finally, there is no evidence that Indian Road is a physical separation that alters the nature and character of the property, such that it would render a quarrying operation as foreign, unexpected or adverse to that area.

Contrary to the dissent, the mere fact that a roadway runs through a portion of a property, later classified as a subparcel by a town attempting to impose zoning restrictions on its usage, is not a per se barrier to the recognition of prior nonconforming use rights to that area. An easement, a roadway or any other narrow area does not necessarily create a physical separation of the land, divesting it of its character so as to prevent a vested right to use that land for its intended purpose. This was also true in *Dolomite*, where the court based its holding—not on the per se basis of the railroad tracks traversing the land—but on the patent unfairness to property owners who had come to live in the area abutting the lands and on the fact that the land south of the railroad tracks had been used for entirely different purposes for many years. Similarly, in this quarrying case, our analysis must take into account the nature of the easement and the character of the land in relation to the areas already quarried.

Subparcel 25D:

Federal leased this subparcel from a Dr. Reinstein for the sole purpose of mining. It is undisputed that this region is contiguous with areas that have been extensively quarried. BCS has not quarried nor acquired a permit to quarry this subparcel before the 1969 ordinance.

The dissent's claim that permits are a prerequisite to establishing prior nonconforming use rights is without authority (*see* dissenting op at 105-106). As we held in *Syracuse Aggregate*, a quarrying company may hold lands in reserve, instead of mining them immediately. Such a company would not necessarily seek a permit for lands that it did not intend to excavate immediately, or at least not until sometime in the future. Imposing this requirement in a quarrying case is a very narrow reading of *Syracuse Aggregate*, and fails to consider the realities of the industry. Nevertheless, mining

permits are strong evidence of a manifestation of intent to mine a given area. They are an important piece of evidence in analyzing the standard set forth in *Syracuse Aggregate*, though not necessary in determining the manifested intent of the quarrying company.

■ Given all of these factors, we hold that an issue of fact remains as to when BCS received legal title to this land. BCS asserts that it acquired a possessory interest in this parcel before the 1969 zoning ordinance. At that time, Federal received a permit to quarry its then-existing mining operations on the Reinstein estates. Although the permits do not specifically cover this subparcel, Federal extensively mined an area contiguous to that section before 1969.

The issue of fact relates to whether subparcel 25D was acquired by BCS's predecessors. If the parcel was part of a sub-parcel actively quarried, then it would be entitled to prior nonconforming use. On the other hand, if it was not, and BCS acquired it in 1991, as the Town contends, then it would not be so entitled.

Subparcels 28A/28B, 29A/29B, 30A/30B and 31-33 (the roadway parcels):

■ Highway Law § 205 (1), in pertinent part, states that if a highway has not "been traveled or used as a highway for six years [it] shall cease to be a highway." These subparcels are small dead end streets that abut property controlled by BCS's predecessors since at least 1967. The Appellate Division found no evidence that these thoroughfares have been used for a period of six years. However, the issue is whether they were left abandoned at least six years prior to the 1969 zoning ordinance so that BCS may demonstrate that it controlled these areas and had an ability to quarry there before the adoption of the ordinance. It is unclear from the record whether these areas were either abandoned or in use prior to 1969. If the Town abandoned these thoroughfares for six years preceding the zoning ordinance, then BCS would be entitled to prior nonconforming use of these areas, since deeming them abandoned does not curtail any long-standing right of enjoyment that the public may have to these areas, but rather creates a property right for the abutting owners, here BCS, in the form of an easement of access to the abutting streets. In addition, we note that for at least 40 years quarrying has occurred on the property abutting the roadways.

Subparcels 17C/25C and 12B/25I:

██ These areas were leasehold interests before the 1969 ordinance, and are located directly contiguous to the immediate south of the AG district. Aerial maps demonstrate that these areas were cleared, grubbed and stripped of topsoil before 1969. Further, they were the subject of quarrying permits before 1969. Applying the principles announced in *Syracuse Aggregate*, we hold that BCS made clear its intent to quarry these areas at a future time, as it was already making preparations to undertake quarrying activity by 1969. Thus, we would confer prior nonconforming use rights to these subparcels, as well.

## V

In conclusion, under our holding in *Syracuse Aggregate*, and given the peculiar nature of quarrying it is unrealistic and unreasonable to require BCS to have actively mined all areas within its 280-acre property prior to the passage of the 1969 zoning ordinance to establish prior nonconfoming use protection for its mining operation. Quarrying contemplates a gradual unearthing of the minerals in the land, and so excavation of portions of the land may be sufficient to manifest an intention to conduct quarrying on the property as a whole. Of crucial importance is the fact that BCS and its predecessors, quarrying companies, have exclusively, and for decades, utilized the land for quarrying. Additionally, they have exhibited the usual indicia of a quarrying enterprise, showing preparations to quarry the subparcels in dispute. Therefore, we hold that BCS is entitled to a declaration that the subparcels at issue are subject to prior nonconforming usage, except for subparcel 25D and the thoroughfare properties, where issues of fact remain unresolved.

Accordingly, the order of the Appellate Division should be modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.

Chief Judge LIPPMAN (dissenting in part). While we agree with the majority that parcels 17C/25C and 12B/25I are entitled to nonconforming use status under our decision in *Matter of Syracuse Aggregate Corp. v Weise* (51 NY2d 278 [1980]), and while we further agree that remittal for a determination of when the roadway parcels were abandoned is appropriate, we conclude that the nonconforming use principles outlined in *Syracuse Aggregate* and *Matter of Dolomite Prods. Co. v Kipers* (23 AD2d 339 [4th Dept 1965], *affd* 19 NY2d 739 [1967]) mandate a

different result for parcels 5 and 25D. Therefore we respectfully dissent.

Prior to today's decision, our nonconforming use analysis was straightforward and well settled. The "overriding policy of zoning is aimed at the ultimate elimination of nonconforming uses," but "a zoning ordinance cannot prohibit an existing use to which the property has been devoted at the time of the enactment of the ordinance" (*Syracuse Aggregate*, 51 NY2d at 284). Necessarily, the owner seeking to use property in a manner that is inconsistent with a zoning ordinance must not only have been able to *legally use* the property in that manner prior to the passage of the zoning ordinance, but the owner must also have actually used the property in that manner or manifested an intent to so use the property prior to the zoning ordinance becoming effective (*id.* at 284-286). The inquiry may be succinctly stated as a two-step process: (1) could the property lawfully be used in the manner desired at the time the restrictive zoning ordinance became effective, and (2) did the property owner either actually use the property in that manner or manifest an intention to so use the property. If the answer to both questions is yes, then the owner is entitled to nonconforming use status; if the answer to either is no, then the owner is not entitled to nonconforming use status. We have further explained that it is not "possible to extend the protection of a permitted nonconforming use established on one parcel of land to physically separate though adjoining parcels" (*id.* at 286, citing, inter alia, *Matter of Dolomite Prods. Co. v Kipers*, 23 AD2d 339 [1965]).

The majority, without saying so, casts aside our prior straightforward analytical framework for nonconforming uses but fails to replace it with any coherent new framework. With respect to parcel 5, on this record (which includes detailed maps as well as aerial photographs of the land), it is plain that Indian Road separates parcel 5 from the land that has been actively quarried. Parcel 5 is, very simply, a "physically separate though adjoining" parcel that under a straightforward application of well settled law should be subject to the zoning ordinance (*id.*). Instead, the majority creates an entirely new test and tells us that, despite the fact that parcel 5 "is divided from the AG District by Indian Road" (majority op at 94), the road should not be understood to separate parcel 5 from the rest of BCS's property because the road "is not a physical impasse" and it "does [not] substantially alter the nature and character of the

property as a whole" (majority op at 100). It seems fairly clear, however, that BCS itself did not see the road as insubstantial; as the majority notes, BCS's predecessor "negotiated, from 1963 to 1969, with the Town to relocate Indian Road for unfettered use of its entire parcel for mining" (majority op at 100). Rather than just demonstrating BCS's intent to mine parcel 5, as the majority concludes, these negotiations demonstrate that BCS itself recognized the reality that Indian Road separated parcel 5 from the remainder of its land such that it did not have "unfettered use" of parcel 5.[1]

The majority has concluded that a factual question exists as to when BCS acquired parcel 25D and therefore does not decide today whether parcel 25D is entitled to nonconforming use status. It is certainly true, as the majority explains, that if BCS did not acquire parcel 25D until 1991 BCS would not be entitled to mine parcel 25D. There is, however, no need to determine whether parcel 25D was in fact acquired as part of the 1959 Reinstein lease because, even if it was acquired then, it still could not have been lawfully mined at the time the zoning ordinance went into effect in 1969. After the 1942 zoning ordinance, there is no dispute that the owner or lessee of parcel 25D would have been required to obtain a permit to use parcel 25D as a quarry. It is further undisputed that parcel 25D was not covered by the permits BCS and/or its predecessors obtained from the Town. Thus, again applying our previously straightforward framework for nonconforming uses, because parcel 25D could not be lawfully mined at the time the 1969 zoning ordinance became effective, it cannot now be entitled to nonconforming use status.

The majority conflates the manifestation of intent to mine with the lawful ability to mine. The majority explains that "mining permits are strong evidence of a manifestation of intent to mine a given area" and that permits "are an important piece of evidence in analyzing the standard set forth in *Syracuse Aggregate*" (majority op at 101-102). There is no question here that BCS and its corporate predecessors intended to mine parcel 25D; the question is whether or not they could have lawfully done so at the time the 1969 zoning ordinance became effective, a question the majority never squarely addresses. Intent to mine and

---

**1.** Moreover, it is entirely unclear how Indian Road may be characterized as a "relatively narrow roadway (49.5 feet)" (majority op at 100). The maps and photographs in the record make clear that Indian Road is just that—a road—and at a width of 49.5 feet, it is a roadway wide enough to accommodate several lanes of traffic.

lawful ability to mine are two separate issues. Although BCS's predecessor manifested an intention to mine parcel 25D, until today that alone was not enough: it also must have been lawful to mine parcel 25D at the time the ordinance went into effect. As BCS concedes, no mining permit was issued for parcel 25D as of 1969, therefore it was not lawful to mine parcel 25D at that time.

It is not, as the majority states, that we conclude that "permits are a prerequisite to establishing prior nonconforming use rights" (majority op at 101) in all nonconforming use cases or even in all nonconforming use cases involving quarrying. Rather, the touchstone in our case law has been *lawful use,* and, in the Town of Cheektowaga, the lawful way to mine at the time the ordinance went into effect (outside of certain districts delineated for mining) was to first obtain a permit to mine from the Town. Because a mining permit was not issued for parcel 25D it could not have been lawfully mined. In remitting as to parcel 25D, the majority opens up the possibility that BCS will be able to mine parcel 25D now, some 40 years after the passage of the 1969 zoning ordinance restricting such usage, despite the fact that BCS's predecessor could not have lawfully mined the property.

By failing to adhere to our prior analytical framework in this context, the majority today muddies an area of law that ought to be predictable for a host of practical purposes. For instance, residents of the Town purchased homes near land that, until today, BCS had no right to mine and this development undoubtedly affects those properties in a variety of ways (*see Matter of Dolomite*, 23 AD2d at 342-343 ["Such a philosophy of planning could stunt or kill the growth of substantial areas of property surrounding the parcels in question, for abutting owners would be required to wait, as in the instant case, for decades to determine the use which could be made of the property"]).

Moreover, local governments are particularly well-positioned to plan for the physical and economic development of the communities and constituencies that they serve. Here, since 1942 when the Town first enacted a zoning ordinance, the Town has sought to control the development of town land used for quarrying purposes. The very fact that, outside certain districts, a permit was required in order to mine land in the Town means that the Town might disallow that use in certain instances. When and in what manner the Town can do so should be predictable and subject to clear rules. Before today, these rules were simple: if a landowner could lawfully use property in a

manner restricted by a new zoning ordinance and either actually used the property in that manner or manifested an intent to do so at the time the new zoning ordinance became effective, that landowner could still use the land in that manner after the passage of the ordinance. This, apparently, is no longer the framework we will apply in nonconforming use cases.

Finally, we agree with the majority that it is unclear on this record when the roadway parcels ceased to be used as roadways by the public. BCS suggests that by at least 1967 they were not used as roadways. If the roadway parcels were used as roadways as late as 1967, then they could not have been abandoned under section 205 of the Highway Law by 1969, and if they were not abandoned, then they could not have been mined lawfully.[2] On the other hand, if the roadway parcels were not traveled upon for the six years prior to the effective date of the zoning ordinance in 1969, then they would have been abandoned pursuant to the Highway Law at the time the 1969 ordinance became effective. If the roadways within the special quarrying district created by the Town were abandoned as of 1969, it appears BCS could have lawfully mined them at the time the 1969 zoning ordinance became effective and the roadway parcels would be eligible for nonconforming use status. When the roadway parcels were abandoned is an open question. Therefore, we agree with the majority's remittal for a determination as to when the roadway parcels ceased to be used by the public as roadways.

In sum, we agree with the majority as to parcels 17C/25C and 12B/25I and would reverse the Appellate Division as to those parcels. We further agree that we should remit for a determination as to when the roadway parcels were abandoned. However, we disagree with the majority as to parcels 5 and 25D and would affirm the Appellate Division as to those parcels for the reasons we have stated.

Judges READ, SMITH, PIGOTT and JONES concur with Judge CIPARICK; Chief Judge LIPPMAN dissents in part in a separate opinion in which Judge GRAFFEO concurs.

Order modified, etc.

---

2. It appears, at least with respect to the roadway parcels, that the majority agrees that both lawful use and a manifestation of intent at the time the restrictive ordinance became effective are required and that a manifestation of intent alone will not suffice.