# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 1
In the Matter of Town of
Southampton et al.,
     Respondents,
et al.,
     Petitioner,
   v.
New York State Department of
Environmental Conservation et
al.,
     Respondents,
Sand Land Corporation et al.,
     Appellants.

Gregory M. Brown, for appellants.
David H. Arntsen, for respondent Town of Southampton.
Robert S. Smith, for respondents 101Co, LLC et al.
New York Construction Materials Association, Inc.; Sierra Club, amici curiae.

CANNATARO, A.C.J.:

The question raised on this appeal is whether Environmental Conservation Law 23-2703 (3) bars the Department of Environmental Conservation from processing all applications for permits to mine in covered counties, including applications for renewal

- 1 -

and modification permits, when "local zoning laws or ordinances prohibit mining uses within the area proposed to be mined" (ECL 23-2703 [3]). We hold that DEC may process renewal and modification applications when such applications seek to mine land that falls within the scope of an undisputed prior nonconforming use. The applications at issue implicate some prior nonconforming uses that are undisputed and others that are disputed but not yet resolved. Because prior nonconforming use was not taken into account by either DEC or the courts below, we modify and remit for further proceedings.

I.

Respondent Sand Land owns and operates a sand and gravel mine on a 50-acre parcel of property within the Town of Southampton, Suffolk County. The mine has been operating continuously since the 1960s, at which time the zoning code allowed mining pursuant to a required permit. In 1972, the Town re-zoned the area where the parcel is located to a residential district in which mining is prohibited. In 1981, Sand Land's predecessor in interest obtained a Mined Land Reclamation Permit (MLRP) from DEC, which was renewed in 1985. In 1998, DEC renewed the MLRP and transferred it to Sand Land, authorizing mining on 31.5 acres to a depth of 160 feet above mean sea level (amsl). In 1998, Sand Land also began receiving and processing vegetative organic waste materials in a 3.1 acre portion of the property known as the "stump dump." In 2011 and 2016, Sand Land obtained certificates of occupancy from the Town stating that the use of the site as a sand mine was a prior nonconforming use. DEC also renewed Sand Land's permit in 2003, 2008, and 2013.

In 2014, Sand Land submitted an application to DEC to modify its permit. The application sought to increase the depth of mining by 40 feet, from 160 feet amsl to 120 feet amsl. The application also proposed mining on an additional 4.9 acres that had not been approved under prior DEC permits, comprised of a 1.8 acre "area of modification" and the 3.1-acre stump dump. DEC initially denied the permit modification, and an Administrative Law Judge rejected Sand Land's challenge to the denial. The ALJ determined that Sand Land's proposed expansion of its mine constituted a material change in permitted activities and was therefore a new application, which triggered the required inquiry into whether the Town's zoning laws prohibit mining at the site.

Prior to the ALJ's determination, DEC issued a Notice of Intent to Modify (NIM) advising Sand Land that it proposed to modify its permit "to require that mining activities at the facility cease and reclamation activities begin." Around the same time, Sand Land submitted a renewal application to DEC because its permit was set to expire. Sand Land and DEC entered into negotiations to resolve all issues related to the NIM and the renewal application. Pursuant to their settlement agreement, Sand Land agreed to "permanently cease the use of the Facility for the receipt, storage, and processing of any volume of vegetative organic waste materials" and conduct quarterly groundwater monitoring. DEC agreed to, among other things, renew Sand Land's permit and allow Sand Land to increase the extent of its current mining activity by three acres, to cover a total of 34.5 acres, and to timely process a modification permit application for mining to be conducted to a depth of 120 feet amsl.

Sand Land thereafter submitted a second application to modify its permit. In March 2019, DEC issued both a renewed permit to Sand Land permitting mining "on the 34.5 acres of the 50[-]acre site" and an Amended Negative Declaration allowing an increase to the depth of mining. Among other things, DEC found that the proposed sand mine deepening would not significantly impact groundwater quality, air quality, traffic, or solid waste production.

The Town of Southampton, several neighboring landowners, and civic and environmental organizations, commenced this CPLR article 78 proceeding against Sand Land and DEC. As relevant here, petitioners sought annulment of the March 2019 renewal permit, the Amended Negative Declaration and the settlement agreement, and to enjoin DEC from processing Sand Land's modification application. Petitioners argued that the 2019 renewal permit improperly expanded the area permitted to be mined from 31.5 acres to 34.5 acres. They contended that Sand Land improperly sought to expand the mine's footprint in a renewal application, rather than a modification application, in order to avoid the restrictions of ECL 23-2703 (3). In June 2019, while the litigation was pending, DEC issued a modified permit authorizing mining within the 34.5-acre footprint to a depth of 120 feet amsl. Petitioners filed a supplemental petition seeking to annul the modified permit.

Supreme Court, among other things, denied the petition and supplemental petition, and dismissed the proceeding. As relevant here, the court determined that the three additional acres should always have been included in the permit, and its addition as part of the settlement was a mere ministerial correction. Thus, the court concluded that the permit

issued as part of the settlement that authorized mining on three additional acres was, in fact, a "renewal" rather than a modification of the previous permit, such that ECL 23-2703 (3) did not apply.  Regarding permission to mine deeper, the court held that the statute does not apply to permit modifications that authorize the holder only to mine deeper within an existing footprint where mining is otherwise authorized.

The Appellate Division modified, holding that "the act of issuing the permits here, in contravention of ECL 23-2703 (3), was arbitrary and capricious" (194 AD3d 1310, 1316).   The court reasoned that, "by its certain language, the statute applies to all applications" (*id.* at 1315), not just "new permits or permits seeking substantial modifications" (*id.* at 1314).   Further, the statute "clearly recognizes that the local laws of the municipality are determinative as to whether an application can be processed" and so here, "where it is unchallenged that the Town's laws prohibit mining, DEC cannot process the application, let alone issue the permit" (*id.* at 1315–16).

Justice Pritzker dissented in part and would have affirmed on the ground that ECL 23-2703 (3) is inapplicable because, "although the Town prohibits new mining operations within its borders, it has both recognized and permitted mining within 'the area proposed to be mined' as a legitimate prior nonconforming use" (*id*. at 1317 *quoting* ECL 23-2703 [3]).  In Justice Pritzker's view, petitioners' interpretation of the statute "as applying to all permits is too broad and could render the law unconstitutional" (*id*.).

This Court granted Sand Land's motion for leave to appeal.

II.

We must first answer whether ECL 23-2703 (3) bars DEC from processing all

applications for permits to mine in covered counties, including applications for renewal and modification. The Mined Land Reclamation Law ("MLRL") (*see* ECL 23-2701 *et seq.*) grants DEC broad authority to regulate the mining industry in the state. The law is intended to encourage a sound mining industry, provide for the management of depletable resources, and assure the reclamation of mined land (*see* ECL 23-2703 [1]). The legislature sought to achieve these purposes through "the adoption of standard and uniform restrictions and regulations to replace the existing patchwork system of local ordinances" (*Matter of Wallach v Town of Dryden,* 23 NY3d 728, 745 [2014]). For that reason, the MLRL contains a "supersession clause" providing that the statute supersedes all "local laws relating to the extractive mining industry" (ECL 23-2703 [2]). In *Matter of Frew Ran Gravel Prods., Inc. v Town of Carroll,* we held that the MLRL's supersession clause does not prevent a municipality from prohibiting mining through its zoning ordinances (71 NY2d 126, 133-134 [1987]).

In 1991, the legislature incorporated this holding by amending the supersession provision in ECL 23-2703 to expressly exempt local zoning ordinances that determine permissible uses (*see* L 1991, ch 166, § 228). In addition, the legislature added a new subsection 3 to ECL 23-2703, central to this appeal, which states:

> "No agency of this state shall consider an application for a permit to mine as complete or process such application for a permit to mine pursuant to this title, within counties with a population of one million or more which draw their primary source of drinking water for a majority of county residents from a designated sole source aquifer, if local zoning laws or ordinances prohibit mining uses within the area proposed to be mined"

(ECL 23-2703 [3]; *see* L 1991, ch 166, § 228). The legislature also amended ECL 23-2711 to require that applications for new mining permits contain a "statement that mining is not prohibited at that location" and that, when an application is received "for a property not previously permitted," DEC inquire of the relevant political subdivision whether mining is prohibited "at that location" (L 1991, ch 166, § 229).

As the Appellate Division correctly concluded, because the question of whether the amendment applies to renewal and modification applications is one "of pure statutory interpretation," we need not defer to any interpretation made by the DEC that the amendment only applies to new applications to mine (*see Matter of DeVera v Elia,* 32 NY3d 423, 434 [2018]). In seeking to understand the meaning of this amendment, it is a bedrock principle of statutory interpretation that "the Court's primary consideration is to ascertain and give effect to the intention of the Legislature" (*Matter of Mestecky v City of New York,* 30 NY3d 239, 243 [2017] [internal quotation marks and citation omitted]). "Inasmuch as the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (*Kuzmich v 50 Murray St. Acquisition LLC,* 34 NY3d 84, 91 [2019] [internal quotation marks and citations omitted], *cert denied* 140 S Ct 902 [2020]). Furthermore, "[a] statute 'must be construed as a whole,' and 'its various sections must be considered together and with reference to each other'" (*Matter of Peyton* v *New York City Bd. of Stds. & Appeals,* 36 NY3d 271, 280 [2020]). "As particularly relevant here, amendments should typically be construed together with the original act" (*Matter of Estate of Youngjohn v Berry Plastics Corp.,* 36 NY3d 595, 604 [2021]).

The plain language of ECL 23-2703 (3) evinces an intent that the provision should apply, not just to applications for new mining permits, but also to applications for modification and renewal. First, the language of the section refers generally to "an application for a permit to mine," and contains no language limiting its application to only "new mines." Indeed, "permit," is specifically defined elsewhere in the ECL to include any "department approval," "modification" or "renewal" (ECL 70-0105 [4]). Thus, read together with the ECL's definition of "permit" in section 70-0105 (4), the phrase "permit to mine" in ECL 23-2703 encompasses all applications to mine, including applications for renewal and modification.

This reading is further supported by the limited applicability of ECL 23-2703 (3) and the circumstances surrounding its enactment (*see Town of Aurora v Village. of E. Aurora*, 32 NY3d 366, 372 [2018] ["Additionally, we should inquire into the spirit and purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history"] [internal quotation marks and citation omitted]). ECL 23-2703 (3) applies only to counties with a population of one million or more that draw their primary source of drinking water from a designated sole source aquifer. The statute's targeted protection of such counties indicates that the legislative purpose of the limitations contained in the statute was to protect drinking water in those counties. It is noteworthy that the only counties in the state that currently meet the

amendment's criteria are Nassau and Suffolk counties, which are two of the state's largest and most densely populated counties and have the lowest quality drinking water.[1]

Local laws in these counties prohibited new mines as far back as 1972, and so, new mines were already prohibited within them when ECL 23-2703 (3) was enacted. As such, the addition of subdivision (3) reasonably appears to have been intended to address the threat to Nassau and Suffolk counties' drinking water posed by the expansion of existing mines—not just the opening of new mines. Otherwise, ECL 23-2703 (3) would have provided no additional protection to the counties that meet its criteria beyond the protections from new mining activities afforded equally to every county in the state by the contemporaneous amendments to ECL 23-2711. Sand Land argues that the legislature's simultaneous amendment of ECL 23-2703 (3) and ECL 23-2711 (3)—the latter of which, as noted, addresses municipal zoning prohibitions in the context of "new mining permit[s]" and mining permit[s] for a property not previously permitted"—indicates that ECL 23-2703 (3) should also be read to bar only new permit applications in the prescribed areas. This argument, however, fails to account for both the plain language which applies to all applications, as well as the relevant statutory context.

III.

---

[1] Elizabeth Moran and Jana Bergere, *What's in My Water?*, NYPIRG, May 2019, at 12; Matthew Chayes, *Report: Long Island's Drinking Water Has Most Contaminants in State*, Newsday, June 5, 2019, at 1; Matthew McGrath, *Big Apple Has New York's Cleanest Water While Long Island Has the Worst: Report*, N.Y. Post, May 29, 2019, at 1; Desiree D'Iorio, *Report: Long Island Has Most Contaminated Drinking Water In New York*, WSHU, May 30, 2019, at 1.

Sand Land maintains that a reading of the statute as governing not only new mine applications but also all modification and/or renewal applications, is constitutionally infirm in that it would infringe upon the property rights of owners of lands which have a prior nonconforming use.

"A statute is presumptively constitutional and should be construed in such a manner as to uphold its constitutionality" (*Eaton v New York City Conciliation & Appeals Bd*., 56 NY2d 340, 346 [1982] citing McKinney's Statutes, § 150). It is well settled that "a nonconforming use of real property that exists at the time a restrictive zoning ordinance is enacted is constitutionally protected and will be permitted to continue, notwithstanding the contrary provisions of the ordinance" (*Jones v Town of Carroll,* 15 NY3d 139, 143 [2010] [internal quotation marks and citation omitted]; *see Buffalo Crushed Stone, Inc. v Town of Cheektowaga,* 13 NY3d 88, 97 [2009]; *Syracuse Aggregate Corp. v Weise,* 51 NY2d 278, 284 [1980]). As such, although nonconforming uses are generally viewed as undesirable and municipalities may gradually restrict them, such restrictions must be "placed in reasonable balance with the owner's interest in not having a property investment abruptly altered or terminated" (*Matter of Pelham Esplanade v Board of Trustees of Vil. of Pelham Manor,* 77NY2d 66, 72 [1990]; *see Buffalo Crushed Stone,* 13 NY3d at 97), taking into account a town's police power to restrict activity for the sake of public health or safety (*see Goldblatt v Town of Hempstead*, 9 NY2d 101 [1961], *affd* 369 US 590 [1962]; *see also Syracuse Aggregate,* 51 NY2d at 286-287).

Here, we note that the legislative amendment in ECL 23-2703 (3) does not itself prohibit mining in any particular location. Instead, ECL 23-2703 (3) implicitly

contemplates that a mining applicant may have prior non-conforming use rights and requires DEC to defer to local town zoning laws when reviewing applications for mining permits.

Section 23-2703 (3) provides on its face that it is applicable only "if local zoning laws or ordinances prohibit mining uses *within the area proposed to be mined*" (emphasis added). If mining in that area is a recognized prior non-conforming use under the local zoning code, then the conclusion follows that the local law does *not* "prohibit mining uses" within the area proposed to be mined. That is, a zoning code that permits mining on a property as a prior non-conforming use cannot logically be said to prohibit that use within the meaning of ECL 23-2703 (3).

This reading of the statute is consistent with the Town's and DEC's past and current practices in dealing with prior non-conforming uses. In 2011 and 2016, well after the enactment of the amendment, the Town granted Sand Land certificates of occupancy stating that mining at the site was a prior nonconforming use, in conformity with the Southampton Town Code (*see* § 30-115 [A] ["Any lawful use occupying any . . . lot or land at the time of the effective date of this chapter or any amendment thereto which does not comply after the effective date of this chapter or any amendment thereto with the use regulations of the district in which it is situated may be continued in the . . . lot or land so occupied" with some limited exceptions]). DEC has also issued renewal permits to Sand Land several times since the MLRL was amended, and it has done the same with other mines on Long Island along the same timeline. Thus, both DEC and the Town have

previously concluded that mining is not entirely prohibited under the relevant local zoning laws.

Although we agree that the statute must be read to be consistent with mine owners' constitutionally protected rights, we reject Sand Land's assertion that mine owners have a constitutional right to mine their parcels to an indefinite depth, limited only by DEC's safety regulations. It is true that we have recognized mining sites to be a "diminishing asset" (*Syracuse Aggregate*, 51 NY2d at 285 [citations omitted]) and, as such, owners of mining sites may secure a "vested right" to expand their mines within their parcel (*Buffalo Crushed Stone*, 13 NY3d at 97 citing *People v Miller*, 304 NY 105, 107-108 [1952]). However, our prior decisions do not, as Sand Land argues, distinguish between horizontal and vertical expansion, and allow vertical expansions to an indefinite depth. Never have we stated that owners' vested rights are unlimited with regard to either the breadth or the depth of a mine. Instead, we have inquired into the extent to which the mine owner demonstrated an intention to mine the relevant portions of the property, regardless of the direction of the expansion in question:

> "A landowner who engages in substantial quarrying activities within its property and *demonstrates an intention* to do so in other portions of the land may sufficiently establish a prior nonconforming use extending to the boundaries of that property, notwithstanding the fact that quarrying may not have actually begun in that specific area."

(*Buffalo Crushed Stone,* 13 NY3d at 98-99 [emphasis added]).

The question then is whether the owner has "engage[d] in substantial quarrying activities on a distinct parcel of land over a long period of time" and thereby "clearly

*manifested an intent* to appropriate the entire parcel to the particular business of quarrying"
(*Syracuse Aggregate,* 51 NY2d at 286 [emphasis added]).  We have already discussed a
variety of activities that may be considered in determining such intent (*see e.g. Jones,* 15
NY3d at 145–146; *Glacial Aggregates*, 14 NY3d at 137–138).[2]  In addition, we have also
stated that "the primary issue in these mining cases was not whether the landowners
acquired vested rights under their permits, but whether the towns had approved or allowed
the nonconforming uses" (*Jones*, 15 NY3d at 144 [observing that "the Town had
acknowledged that there was no other reasonable use for the property and granted plaintiffs
a variance that covered all 50 acres"]).

Here, ECL 23-2703 (3) does not eliminate or alter non-conforming use.  Rather, the
statute acts only as a protection against further expansion of those mining activities—
beyond the permissible non-conforming use.

IV.

_____

[2] We have recognized that "mining permits are strong evidence of a manifestation of intent
to mine a given area," though they are not the only possible evidence to establish the extent
of a prior nonconforming use (*Buffalo Crushed Stone Inc. v Town of Cheektowaga*, 13
NY3d 88, 101-02 [2009]).  For example, an intent to quarry a particular section of a parcel
was demonstrated by the owner's "preparation of maps to survey the potential materials to
be extracted from the subparcel, putting 6,000 feet of pipe in place, negotiations to relocate
a road, correspondence expressing an intent to mine the subparcel, preparations for removal
of dirt, and drilling auger holes to identify areas for quarrying" as well as the clearing,
grubbing and stripping of topsoil (*see Glacial Aggregates*, 14 NY3d at 137–138).
Similarly, we concluded that intent to quarry was demonstrated by evidence that the owner
of the parcel "dedicated substantial areas around the actual landfill site for related purposes,
purchased necessary heavy equipment (such as a bulldozer, a backhoe, an excavator, a
loader and a dump truck), employed a dozen people, developed plans for multi-stage
enlargement of the landfill and engaged in discussions with investors regarding future
operations" (*Jones,* 15 NY3d at 145–146).

The dispositive questions in determining whether the expansion that Sand Land seeks is within the limits of its prior non-conforming use are whether Sand Land manifested an intent to mine the additional acres and the expanded depth it sought in its permit applications, and the extent to which the Town recognized Sand Land's use of the parcel. Both sides agree that the Southampton Town Code protects prior nonconforming uses. However, despite extensive litigation in this case, at no juncture has there been a determination of the extent of Sand Land's prior non-conforming use. DEC and Supreme Court concluded that the statute is inapplicable to modification and renewal permit applications and, therefore, the extent of the prior non-conforming use held by Sand Land was irrelevant to their decisions. The scope of non-conforming use was likewise irrelevant to the Appellate Division's determination since that court reasoned that ECL 23-2703 (3) bars DEC from processing all renewal and modification applications.

In the absence of a determination of the scope of Sand Land's prior non-conforming use, we cannot say whether, under the statute, DEC will ultimately be able to process the renewal and modification permit applications at issue in this case, both of which contained an expansion of the mine, in whole or in part. For that reason, we agree with the Appellate Division that the permits must be annulled, albeit for different reasons than those stated in its decision, and we remit the matter to Supreme Court to remand to DEC for further proceedings. Upon remand DEC must first ascertain from the Town, in a manner consistent with this opinion, whether Sand Land's proposed use is within the scope of any prior non-conforming use (*see People v Iverson*, 37 NY3d 98, 103-104 [2021] ["Ultimately, this Court should give the statute a sensible and practical over-all

construction, which is consistent with and furthers its scheme and purpose and which harmonizes all its interlocking provisions"] [internal quotation marks omitted]). Ultimately, ECL 23-2703 (3) will bar DEC from processing any application that seeks to mine beyond the scope of prior nonconforming use. Should Sand Land disagree with the determination of the scope of its prior nonconforming use, it can litigate that issue in the proper forum for resolving local zoning disputes.

Accordingly, the Appellate Division order insofar as appealed from should be modified, without costs, by remitting to Supreme Court with directions to remand to DEC for further proceedings in accordance with this opinion and, as so modified, affirmed.

Order insofar as appealed from modified, without costs, by remitting to Supreme Court, Albany County, with directions to remand to New York State Department of Environmental Conservation for further proceedings in accordance with the opinion herein and, as so modified, affirmed. Opinion by Acting Chief Judge Cannataro. Judges Garcia, Wilson, Singas and Troutman concur. Judge Rivera took no part.

Decided February 9, 2023